ENGINE MANUFACTURERS
ASSOCIATION,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY and Carol M. Browner,
Administrator, Respondents.

No. 92–1403.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 10, 1993.

Decided April 15, 1994.

Stephen Fedo, Chicago, IL, argued the cause for petitioner. With him on the briefs was Jed R. Mandel, Chicago, IL.

Glen Freyer, Trial Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for respondent. With him on the brief was Alan W. Eckert, Associate Gen. Counsel, U.S. Env. Pr. Ag., Washington, DC.

Before WALD, BUCKLEY, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Engine Manufacturers Association challenges a final rule of the Environmental Protection Agency assessing engine manufacturers for the full cost of the agency's Motor Vehicle and Engine Compliance Program under which it tests vehicles and engines for compliance with the emissions standards of the Clean Air Act. *See Motor Vehicle and Engine Compliance Program Fees for: Light–Duty Vehicles and Trucks; Heavy–Duty Vehicles and Engines; and Motorcycles,* 57 Fed.Reg. 30,044 (1992) (to be codified at 40 C.F.R. pt. 86). We hold that because the Compliance Program confers a specific, private benefit upon the manufacturers, the EPA can lawfully recoup from them the reasonable cost of the program. We remand the matter, however, for the agency to explain the basis upon which it computed the fees it is assessing.

## I. Background

Under the Clean Air Act, each new motor vehicle and motor vehicle engine manufactured for sale in the United States must comply with certain emissions standards throughout its useful life. 42 U.S.C. § 7521(a)(1). Every year the manufacturer of a vehicle or engine must obtain from the EPA a compliance certificate for each vehicle or engine type in order to sell its equipment. 42 U.S.C. §§ 7522(a), 7525(a). As part of its application for such a certificate, the manufacturer must certify that the vehicle or engine complies with, and throughout its useful life will comply with, the applicable emissions standards.

The EPA's Compliance Program is a comprehensive testing regime intended to ensure that vehicles and engines do in fact meet and continue to meet the emissions standards of the Act. Pursuant to the Compliance Program, vehicles and engine types are tested at three different stages. First, in anticipation of applying for an initial certification, the manufacturer tests the engine or vehicle prototype. 42 U.S.C. § 7525(a). Second, in what is called a selective enforcement audit, the EPA may test an individual vehicle or engine taken from the assembly line. 42 U.S.C. § 7525(b)(1). Finally, the agency may require that an engine or vehicle be tested after it has been in use for a period of time. 42 U.S.C. § 7541(b). At each successive stage, the EPA tests fewer engine and vehicle models; thus, every engine or vehicle model is tested prior to certification, but not every one will be chosen for a selective enforcement audit, and fewer still will be tested for compliance in use.

If a vehicle or engine fails to meet emissions standards at the first stage of testing, then the EPA will not grant the manufacturer a compliance certificate; if it fails at the second stage, then the EPA may suspend or revoke the certificate. If the vehicle or engine fails to meet emissions standards after it has been in use for a time (regardless whether it is still in production), then the EPA may require the manufacturer to recall the product at the manufacturer's expense.

The Clean Air Act Amendments of 1990 authorize the EPA to promulgate regulations, consistent with the Independent Offices Appropriations Act, "establishing fees to recover all reasonable costs" it incurs in connection with this three-stage Compliance Program. 42 U.S.C. § 7552(a). The IOAA, in turn, authorizes each federal agency to collect a fee from the beneficiary of "each service or thing of value" it provides in order to make such service "self-sustaining to the extent possible." 31 U.S.C. § 9701(a). The statute itself describes only generally how an agency should determine the amount of such a fee: it may impose upon a beneficiary only a charge that is "fair," taking into consideration "the costs to the Government; the value of the service or thing to the recipient; [the] public policy or other interest served; and other relevant facts." 31 U.S.C. § 9701(b)(2).

The EPA set out to determine the amount of the fee it could charge each engine manufacturer, per compliance certificate issued to it, by adding up its annual direct and indirect recoverable costs for each type of certification (motorcycle, light-duty, and heavy-duty) and dividing that amount by the number of requests it receives each year (on average) for certifications of each type. *Notice of Proposed Rulemaking*, 56 Fed.Reg. 30,230, 30,235 (1991). The resulting annual fee, multiplied by the number of certificates a manufacturer holds, represents that manufacturer's share of all costs the EPA incurs with respect to the Compliance Program that year, not only for certification testing but also for selective enforcement auditing and in-use testing—regardless of the extent to which that manufacturer's engines or motor vehicles may be subjected to second or third stage testing. 57 Fed.Reg. at 30,048.

The EMA now challenges the EPA's authority under the IOAA to recoup its full cost of running the Compliance Program, on the ground that selective enforcement audits and in-use compliance testing, as opposed to initial product certification, provide no benefit to engine manufacturers. In the alternative, the Association contends that the proposed fees are excessive and that the agency provided insufficient cost justification for them.

## II. ANALYSIS

 Under the IOAA an agency may impose a fee only for a service that confers a specific benefit upon an identifiable beneficiary, *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 349, 94 S.Ct. 1151, 1154, 39 L.Ed.2d 383 (1974). A general benefit conferred upon an industry, such as the public confidence that may attend the mere fact of its regulation, is insufficient to justify a fee. *New England Power Co.*, 415 U.S. at 350, 94 S.Ct. at 1154; *National Cable Television Ass'n v. FCC*, 554 F.2d 1094, 1097 (D.C.Cir.1976). If the agency does confer a specific benefit upon an identifiable beneficiary, however, then it is of no moment that the service may incidentally confer a benefit upon the general public as well. *National Cable Television Ass'n v. FCC*, 554 F.2d at 1103. In a regulated industry, a certificate of approval is deemed a benefit specific to the recipient. *New England Power Co.*, 415 U.S. at 349 n. 3, 94 S.Ct. at 1154 n. 3; *National Cable Television Ass'n v. FCC*, 554 F.2d at 1102–03.

 An agency may not charge more than the reasonable cost it incurs to provide a service, or the value of the service to the recipient, whichever is less. *National Cable Television Ass'n v. FCC*, 554 F.2d at 1104–07. If the service provides both a specific benefit to an identifiable beneficiary and an independent benefit to the public, then the agency must prorate its costs, lest the specific beneficiary be charged for agency costs attributable to the public benefit. *National Cable Television Ass'n v. United States*, 415 U.S. 336, 343, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974); *Electronic Indus. Ass'n v. FCC*, 554 F.2d 1109, 1115 (D.C.Cir.1976).

### A. *The Benefit Criterion*

 The EMA does not dispute that a compliance certificate confers a specific benefit upon an engine or vehicle manufacturer or that the EPA may therefore recover its costs of administering the certification program. The EMA maintains that selective enforcement audits and in-use compliance testing, however, are simply means of enforcing the emissions standards of the Clean Air Act; the benefits of such second and third stage testing, it claims, "accrue exclusively to the public" in the form of cleaner air, and are unrelated to the private benefit conferred upon engine manufacturers by the certification process, namely, the right to sell their products. For the following reason, we do not agree.

Selective enforcement audits and in-use compliance testing are integral parts of the compliance regime to which a manufacturer submits when it first applies for a certificate; passing each successive compliance test is necessary in order to keep its product certified for sale and to avoid the cost of a recall. Selective enforcement audits and in-use compliance testing are therefore services that the EPA renders to each manufacturer in order for the manufacturer to comply with the Clean Air Act. *See Electronic Indus. Ass'n*, 554 F.2d at 1115. It follows that the manufacturer obtains a benefit from the entire Compliance Program, not just from the annual certification. The situation would be no different, from an economic point of view, if the Clean Air Act required that each manufacturer arrange for an independent entity to test its products off the assembly line and in use, and the EPA offered to do the tests; it would just be more obvious that the EPA is providing a service for which it is entitled to a reasonable fee.

The private benefit conferred in the latter phases of the Compliance Program, moreover, is specific to the manufacturer. The public benefits associated with cleaner air are incidental to, not independent of, that private benefit, in the sense that they are produced at no cost beyond that required to produce the private benefit. *See Central & Southern Motor Freight Tariff Ass'n v. United States*, 777 F.2d 722, 732 (D.C.Cir.1985) ("If the asserted public benefits are the necessary consequence of the agency's provision of the relevant private benefits, then the public benefits are not independent, and the agency would therefore not need to allocate any costs to the public"); *Electronic Indus. Ass'n v. FCC*, 554 F.2d at 1115 (describing by example the difference between incidental and independent benefits). *Accord Mississippi Power & Light v. United States Nucle-*

*ar Regulatory Comm'n,* 601 F.2d 223, 231 (5th Cir.1979).

The EMA points out that not every vehicle or engine model is tested after certification, arguing that selective testing is characteristic of an enforcement measure—not of a benefit conferred upon those made subject to it. While the general point is well-taken, it does not avail in this regulated context, in which the ability to sell one's product (or to avoid a costly recall) must be regarded as a benefit conferred by the government. The manufacturer benefits from second and third stage compliance testing because, as we have seen, such testing is integral to the regulatory scheme under which each engine or vehicle model must be recertified annually. Accordingly, every manufacturer benefits from selective testing even though its equipment may not be tested in any given year. A particular manufacturer can hardly object simply because not all of its products are tested every year. *See National Cable Television Ass'n v. FCC,* 554 F.2d at 1103 ("a fee may be permissible in certain situations despite a lack of contacts between the agency and the person assessed during the year in question").

### B. *The Agency's Basis for the Fees Charged*

 Under the Clean Air Act the EPA may recover only the reasonable costs of compliance testing, *see* 42 U.S.C. § 7552(a); under the IOAA, moreover, the fee may not exceed the value of the benefit derived by the manufacturer. *National Cable. Television Ass'n v. FCC,* 554 F.2d 1094, 1106 (D.C.Cir. 1976). The EPA must calculate the cost basis for the fee by allocating its direct and indirect expenses to the smallest practical units of service provided, *Electronic Indus. Ass'n v. FCC,* 554 F.2d at 1117, which the EPA has determined, and the EMA does not dispute, are the three stages of the Compliance Program for each category (motorcycle, light- and heavy-duty) of vehicle or engine. The agency must provide a "public explanation of the specific expenses included in the cost basis for a particular fee, and an explanation of the criteria used to include or exclude particular items." *Id.* Finally, the Administrative Procedure Act requires the

agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule. *See* 5 U.S.C. § 553(b) (agency must give notice of proposed rulemaking); *Connecticut Light and Power Co. v. NRC,* 673 F.2d 525, 530–31 (D.C.Cir.1982) (notice includes available data and studies in intelligible form so that public sees "accurate picture of reasoning" used by agency to develop proposed rule).

The EMA contests the fee schedule adopted by the EPA on the ground that the agency failed to provide sufficient justification for the costs recovered through the fees. To be sure, the EPA purported to set out the basis for its recoverable costs in a 30–page cost analysis that it made available on request during the period for public comment upon the proposed fee schedule. Having inspected that document without enlightenment, however, we hold that the agency failed to provide a reasonable explanation of the cost basis for its fee proposal. In our view, a reasonable explanation of the cost basis for the proposed fees would be one that the concerned public could understand, at least with the aid of other information that was also reasonably available to the public during the time for public comment.

In this case the EPA cost analysis contains page after page of impressive looking but utterly useless tables that appear to have been prepared for internal agency use. Only four of the 30 pages contain any text, and one of those is a rather cursory introduction. The text on each of the other three pages consists primarily of a list of assumptions used in the cost study. Many of those assumptions are complete gibberish to anyone on less than intimate terms with the inner workings of the agency. *See, e.g., Motor Vehicle and Engine Compliance Program Fees Cost Analysis* at 5 ("MOD total FTE allocation is 56.1 from EPA FY91 budget. These were then spread over MOD program elements according to the budget, with slight modification to adjust for 'waivers' function which is incorrectly assigned to SEA in the budget but is really handled by Recall Branch").

Several other features of the cost analysis contribute to its opacity. First, it provides no basis for a number of key assertions. For example, it states conclusorily that "approximately 63% of Certificate Division's costs are determined to be recoverable through fees." Are determined how? Likewise, the agency reports that based upon "an analysis of each FTE's relationship to the testing function" "84% of EOD's total costs are considered to be testing-related." What analysis? And what makes work "testing-related?" Did the EPA apportion full-time equivalents who do some but not all of their work on testing? Or did it count any FTE a majority (or any?) of whose work is on testing? There is no way to know the agency's methodology from what little it reveals in the cost analysis.

Second, the EPA offers little justification for its determination of recoverable labor and labor-related costs. Instead, agency components report that, with respect to one type of cost, their determinations were based variously upon (as mentioned above) "an analysis of each FTE's relationship to the testing function"; "a review of the Federal Test Procedure Equivalents"; "fiscal year 1991 FTE's [sic] assigned in the EPA budget program element entitled 'Emissions and Fuel Economy Compliance'"; and "estimates made by appropriate section and branch chiefs." Using four or more different methods of determining recoverable labor costs gives the impression that the agency did no more than compile submissions from various bureaus without determining whether each one proceeded reasonably, let alone prescribing a uniform methodology for them to follow. In the face of such apparent inconsistency, unadorned by any attempt at explanation or justification, the court can have no confidence that the agency determined with reasonable care the sum of its costs that the fees are supposed to recover. While we do not require that the agency perform time and motion studies in order to justify recoverable labor-related costs—as some agencies have done, see, e.g., Central & Southern, 777 F.2d at 736-37—we really must insist that it provide some reasonable basis for its conclusions.

Third, the EPA also uses a variety of methods for determining the recoverable portion of non-labor costs for each agency component, again without explaining why it chose one method over others for any particular type of cost. In order to determine recoverable direct expenses, for example, the agency allocated non-labor costs for one bureau solely upon the basis of FTEs; for another upon the basis of FTEs, contracts, and interviews; and in a third upon the basis of FTEs, estimated actual costs, and "FTE COMB," which allocates costs by "backing out discrete items or budgets, allocating them, and then allocating remainder by FTE." Moreover, the "FTE COMB" approach bears a striking resemblance to a method that we have previously disallowed. See National Cable Television Ass'n v. FCC, 554 F.2d 1094, 1105 (D.C.Cir.1976) (disallowing cost allocation based upon total budget less discrete non-recoverable costs).

The EPA's allocation of indirect expenses is also inconsistent on its face. The agency seems, reasonably enough, to have allocated some indirect building-related costs, such as utilities and facility support contracts, upon the basis of the square footage dedicated to a recoverable activity. Without explanation, however, it allocated other indirect building-related costs, including rent and office expansion, upon the basis of labor. That decision may also be reasonable, although the reason is not self-evident. The unexplained inconsistency, however, is not reasonable.

The EMA also complains that the agency's proposed fee for a carryover engine certification, which is the same as the fee for a new certification, is far in excess of its actual cost. An engine that has not changed from the prior certificated year ordinarily requires no additional first stage testing; it is granted a carryover certificate based upon the original testing data. The EPA nonetheless asserts in the final rule document, without elaboration, that the costs it may incur for carryover certificates "do not differ substantially" from initial certification. 57 Fed.Reg. at 30,053. In its response to comments received during final rulemaking, the agency recounted some vague and unsubstantiated considerations leading it to this conclusion. Even with the

benefit of the data in the cost analysis, however, we cannot evaluate either the EMA's claim or the agency's conclusion to the contrary. Without any identified factual basis, the agency's belief provides little comfort; the EPA can and must do better.

Accordingly, we remand this matter to the EPA for a more detailed cost justification of the Compliance Program fee schedule. The agency should provide an explanation, in intelligible if not plain English, that at a minimum reveals how it determined which of its costs are recoverable, the justification(s) underlying its choice of cost allocation methods, and a reasoned basis for the agency's belief that it incurs the same costs for a carryover certification as it does for a new certification.

## C. *The EMA's Other Claims*

■ The EMA's three other claims are without merit. First, the Association argues that the EPA does not have the authority even to conduct an in-use compliance testing program for heavy-duty vehicles and engines, much less to charge the manufacturers for the cost of it. The EMA points out that the Clean Air Act did not specifically mention in-use testing until it was amended in 1990, at which time the Congress added provisions for in-use testing of light-duty vehicles and engines as of model year 1994. *See* 42 U.S.C. § 7541(c)(4) and (5). The EMA would have us draw the negative inference that the EPA had no statutory authority to establish an in-use compliance program before 1990 and even now has no authority for in-use testing of heavy-duty products.

That would be an egregious misreading of the Clean Air Act. Since 1970 the Act has authorized the EPA to test "any class or category of vehicles or engines" at any time during their useful lives. 42 U.S.C. § 7541(c)(1). In 1990 the Congress merely added interim and final standards for in-use testing of light-duty vehicles and engines because the Clean Air Act Amendments of 1990 subject those vehicles to increasingly stringent emissions standards for successive model years. The provision of new testing standards does not imply a prior want of authority for testing. The EPA clearly has, and long has had, the authority to test any class of vehicle or engine in use.

■ Second, the EMA makes an argument based upon § 217(a) of the Clean Air Act, which provides that manufacturers of heavy-duty vehicles or engines may be charged "a reasonable amount to recover an appropriate portion of [the EPA's] reasonable costs" of the Compliance Program. According to the EMA, the Congress intended that heavy-duty manufacturers be charged a fee that recovers less than their fair share of the total cost of the Compliance Program because they face smaller sales volumes and more onerous compliance testing than do manufacturers of light-duty vehicles and engines. The EPA responds that it has given effect to § 217(a): first, by segregating the costs of heavy-duty, light-duty, and motorcycle certificates (which reduced the cost per certificate for heavy-duty manufacturers by 29%), 57 Fed.Reg. at 30,046; and second, by waiving the fee to the extent that it exceeds one percent of the projected sales revenue for any manufacturer. 57 Fed.Reg. at 30,056 (to be codified at 40 C.F.R. § 86.908–93(a)).

While it is reasonably clear that the Congress intended that the EPA charge manufacturers of heavy-duty engines and vehicles something less than it charges other manufacturers, the statute is silent as to both the means by which and the degree to which the agency is to do so. In this circumstance, the agency need only do something that moves non-trivially in the direction that the Congress intended. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778,' 2782, 81 L.Ed.2d 694 (1984). Here what the EPA has done is by no means of trivial advantage to the heavy-duty manufacturers; therefore we cannot say that it is so deficient as to frustrate the intent of the Congress.

■ Finally, the EMA asks us to declare that the EPA is without statutory authority to recover its costs of "regulation development, emission factor testing, air quality assessment, and inspection and maintenance activities," none of which the agency has so far counted among the recoverable costs of the Compliance Program. 57 Fed.Reg. at 30,048. The EMA argues that because the EPA left open the possibility that it might, "in the future when the fee schedule is revis-

ited," 57 Fed.Reg. at ·30,047, determine that those costs are recoverable, the EPA has merely "deferred implementation" of a revised cost schedule that includes them.

Because the EPA deferred further consideration of the recoverability of these cost elements, and took no final action with respect to them, the EMA's challenge is not ripe for review. Presumably the EPA will provide an opportunity for public comment prior to promulgating a final rule providing for their recovery; it has said as much. *See* 57 Fed.Reg. at 30,056 (to be codified at 40 C.F.R. § 86–911–93(e)) ("When changes [to Compliance Program fees] are made based on periodic reviews, the changes will be subject to public comment"). In any event, final agency action must precede judicial review, not vice versa.

### III. CONCLUSION

In summary, we hold that the EPA has the authority to assess manufacturers of light- and heavy-duty engines and vehicles fees calculated to recoup the agency's costs of administering the Compliance Program, including the costs it incurs for issuing compliance certificates, conducting selective enforcement audits during production, and testing selected equipment in use. As more fully explicated in Part II.B of this opinion, however, we remand this matter to the agency for a clear explanation of the cost basis for the fee schedule it adopted.

We are willing to assume for now that the agency's error was one of form and not of substance, i.e., that it will be able to provide the information necessary to explain its cost allocation decisions. Therefore we reject the petitioner's request that we vacate the Compliance Program fees without awaiting the result of the agency's efforts on remand. *See International Union, UMW v. Mine Safety & Health Admin.,* 920 F.2d 960, 966–67 (D.C.Cir.1990) ("We have commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking").

*So ordered.*