**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, et al.,**
Plaintiffs,

v.

**UNITED STATES COAST GUARD,**
et al., Defendants.

Civ. A. No. 93–0787–LFO.

United States District Court,
District of Columbia.

Nov. 23, 1994.

Stanley M. Brand, David E. Frulla, Brand & Lowell, P.C., Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., J. Ramsey Johnson, U.S. Atty., Sandra M. Schraibman, Renee W. Wohlenhaus, Dept. of Justice, Civ. Div., Washington, DC; Mike Russell, Lt. T. Lennon, U.S. Coast Guard, Office of Chief Counsel, of counsel, for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

This case arises out of the Coast Guard's establishment of fees for marine licensing, certification of registry and merchant mariner documentation. 58 Fed.Reg. 15228 (Mar. 19, 1993). Plaintiffs include organizations that represent many different types of seamen, marine engineers, deck officers, radio/electronics officers, masters, licensed officers, and other maritime personnel. Plaintiffs also include five individuals who are subject to the Coast Guard's license and document fee requirements. For reasons to be set forth, an accompanying Order denies defendant's motion for summary judgment. The Order also grants in part and denies in part plaintiffs' motion for summary judgment, and remands this case to the Coast Guard for further calculations of the costs of its licensing and documenting activities.

### I.

#### A.

On November 5, 1990, Congress passed the Omnibus Budget Reconciliation Act (the "1990 Budget Act"). On June 20, 1991, the United States Coast Guard ("Coast Guard") issued a Notice of Proposed Rulemaking proposing to establish fees for the issuance of merchant marine licenses (both upper and lower level), certificates of registry, and merchant mariner documents. 56 Fed.Reg. 28448. The Notice of Proposed Rulemaking included an invitation to comment. The original 45–day comment period ended on August 5, 1991. The Coast Guard reopened the comment period on December 18, 1991. The second comment period closed on February 18, 1992.

The Notice of Proposed Rulemaking proposed dividing the fees into three identifiable phases in order to avoid charging people who begin, but fail to complete, the process of obtaining the document they sought. According to the Notice, the first phase is the evaluation of the application. Evaluation includes establishing an individual's file, completing paperwork for a Federal Bureau of Investigation (FBI) criminal record check for first-time applicants, searching through Coast Guard and other government records, making verifications, and conducting follow up phone calls. When the Coast Guard determines whether or not an applicant has met the prerequisites, the evaluation phase is complete. Notice of Proposed Rulemaking, 56 Fed.Reg. at 28449.

The evaluation fee was set at $70 for an upper level license, $65 for a lower level license, and $45 for a radio officer. The evaluation fee for renewals of licenses and endorsements [1] was set at $45. The evaluation fee for a certificate of registry was also set to vary by type. For a chief purser, purser or senior assistant purser, the evaluation fee was set at $45; for a junior assistant purser, medical doctor or professional nurse, there was no fee. The evaluation fee for a merchant mariner's document was set at $60 when accompanied by a "qualified rating"; otherwise, there was to be no charge. An additional $17 fee was to be charged at the evaluation phase for the FBI criminal record check if the applicant sought an original (i.e. first-time) license, original certificate of reg-

---

1. An "endorsement" is "a provision added to a license which alters its scope or application. An example of an endorsement is a tonnage limita-

tion increase within a general tonnage category, a pilot license route addition, or a radar observer qualification." 46 C.F.R. § 10.103 (1993).

istry, or original merchant mariner document.

The second phase is the examination phase. The examination phase includes the scheduling, proctoring, and grading of the necessary examinations as well as notifying applicants of the results. Like the evaluation fee, the examination fee was also set to vary by type. The examination fee for an upper level license was set at $225 and for a lower level license at $80. Radio officer licenses do not require an examination. The examination fee for renewals of licenses and endorsements was set at $55. There was to be no examination for a certificate of registry. The examination fee for a merchant marine document was set at $60 for a "qualified rating"; otherwise, there was to be no examination.

The third phase is the issuance of the license, certificate or document. For all three types of documents, the issuance fee was set at $35. The Coast Guard claimed that the issuance fee was the same since the actual preparation of the different types of documents involves similar amounts of time.

### B.

To determine the total costs of its licensing and documenting activities, the Coast Guard added together three costs: personnel and associated infrastructure; collection; and, FBI checks. Final Rule, 58 Fed.Reg. 15228, 15231 (Mar. 19, 1993).

The bulk of the costs were the personnel and associated infrastructure costs, which include office space; office equipment and supplies such as telephones, computers and copiers; special training; and other personnel-related costs. The Coast Guard derived the information about the personnel and associated infrastructure costs from two surveys: the 1988 Task Analysis Survey and a 1989 G–MP Workload Analysis Survey. It used the 1989 G–MP Survey to determine the total of these costs, Ad.Rec. 668–71, and used the 1988 Task Survey to determine the individual costs for each type of document and each of the phases of the process.

The Coast Guard determined that there were 145 full-time equivalent employees in the 17 Regional Examination Centers directly involved in licensing and documenting activities or providing relevant administrative support. From information in the survey, the Coast Guard divided this group into three categories of employee: clerical, examiner and executive. Of the 145 positions, 52 positions were clerical, 67 were examiner; and, 26 were executive. Based on standard rates provided in the Coast Guard Standard Rate Instruction, COMDTINST 7310.1D (Ad. Rec. 363), the Coast Guard put the cost of a clerical position at $14/hour; an examiner position at $20/hour; and an executive position at $23/hour. The standard number of work hours per employee per year is 1715. COMDTINST M5312.11A (Ad.Rec. 373). From this, the Coast Guard determined the costs of its licensing and documenting activities in the Regional Examination Centers.

To the total of the costs from the Regional Examination Centers, the Coast Guard then added a 29% surcharge, which represented the District and Headquarter's support used. The total amounted to an original annual estimate of $5.9 million.

The second cost was the collection cost. The annual collection cost was originally estimated at $300,000. The third cost was for FBI criminal record checks. For each check, the FBI charges the Coast Guard $17. Based on an estimate of approximately 16,-000 FBI checks per year, the Coast Guard estimated the total cost for FBI checks at $270,000. Thus, the original total estimated cost was $6.5 million.

Using the 1988 Task Survey, the Coast Guard calculated the personnel and associated infrastructure costs for each type of document and for each of the three phases of obtaining it in order to determine an average transaction time per applicant. From this, the Coast Guard determined the individual fee for each type of document and each phase of the process. Based on adjustments and rounding, the Coast Guard determined the initial fees included in the Notice of Proposed Rulemaking. After the adjustments and rounding, the total estimated cost of $6.5 million resulted in a total charge to those seeking a license, certificate or document of $6.1 million.

### C.

On August 5, 1991, plaintiffs filed a request, pursuant to the Freedom of Information Act, for much of the information on which the fees were based. On September 17, 1991, plaintiffs sought more information, this time requesting data from the 1989 G–MP Workload Analysis Survey used to determine the number of full-time equivalent employees at each Regional Examination Center and data substantiating the number of new merchant marine licenses, certificates of registry and merchant mariner documents issued annually at each Regional Examination Center. Ad.Rec. 461.

The Coast Guard provided information from the 1989 G–MP Workload Analysis Survey for all of the Regional Examination Centers but provided data about the volume of documents issued during the 1989 Fiscal Year for only seven of the Regional Examination Centers: Baltimore, Charleston, New Orleans, Houston, Toledo, Seattle/Puget Sound, Honolulu. These data only included merchant mariner documents and certificates of registry and did not include the number of merchant marine licenses. Ad.Rec. 503–519; 521.

Based on these data, plaintiffs were able to calculate the average number of person hours spent in order to issue one document at each of the Regional Examination Centers. This number varied from one Regional Examination Center to another. In Baltimore, the issuance of a single document took an average of 13.46 person hours; in Charleston, 27.01 hours; in New Orleans, 5.41 hours; in Houston, 2.80 hours; in Toledo, 20.32 hours; in Puget Sound/Seattle, 7.66 hours; in Honolulu, 4.22 hours. Levin Affidavit ¶ 17.

On March 19, 1993, the Coast Guard issued a final rule entitled "User Fees for Marine Licensing, Certification of Registry and Merchant Mariner Documentation" to become effective on April 19, 1993. 58 Fed.Reg. 15228. The rule established the fees that had been proposed in the Notice of Proposed Rulemaking.

Between the Notice of Proposed Rulemaking and the Final Rule, the Coast Guard reduced the total charges. Among the reductions to the total were a decrease in the upper level examination fee from $225 to $150 and a fee exemption for youth-oriented, not-for-profit, charitable organizations involved in teaching maritime skills. 58 Fed. Reg. 15230 (1993). These resulted in total reductions of approximately $900,000. The estimate of the annual collection cost was increased slightly, but that increase was not incorporated into the final fees. Thus, the final regulation resulted in a total of $5.2 million estimated to be collected from those seeking licenses, certificates and merchant marine documents.

In addition to setting the fees, the regulation further stated that "[t]he Coast Guard will review the fees annually to determine if adjustments or changes to the fees are necessary, and it will revise these fees when costs change due to inflation, deflation, or changes in the way the services are provided." 58 Fed.Reg. at 15231.

On April 15, 1993, plaintiffs brought suit seeking a Declaratory Judgment and a Preliminary and Permanent Injunction. On August 25, 1993, defendants filed a Motion for Summary Judgment. Plaintiffs filed an Opposition on October 13, 1993 and simultaneously filed their own Motion for Summary Judgment. A hearing on the cross-motions was held on February 24, 1994.

### II.

### A.

Plaintiffs argue that the user fees are based on an unconstitutional delegation of the taxing power by Congress to the Executive Branch.

In order for a delegation of the taxing power to be constitutional, Congress needs only set standards with sufficient specificity for a court to be able to determine whether the will of Congress has been obeyed. *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 218–19, 109 S.Ct. 1726, 1730–31, 104 L.Ed.2d 250 (1989).

The 1990 Budget Act, pursuant to which defendants issued the user fees, amended 46 U.S.C. § 2110(a) as follows:

(a)(1) Except as otherwise provided in this title, the Secretary shall establish a fee or charge for a service or thing of value provided by the Secretary under this subtitle, in accordance with section 9701 of title 31.

. . . . .

(3) The Secretary may, by regulation, adjust a fee or charge collected under this subsection to accommodate changes in the cost of providing a specific service or thing of value, but the adjusted fee or charge may not exceed the total cost of providing the service or thing of value for which the fee or charge is collected, including the cost of collecting the fee or charge.

■ The amended subsection 2110(a) incorporated by reference the Independent Offices Appropriation Act, 31 U.S.C. § 9701, originally passed in 1952 and commonly known as the "general user fee statute." Thus, the authority for the Coast Guard fees is the general user fee statute.

The Supreme Court and the Court of Appeals have addressed agency fee setting under the general user fee statute many times. *See e.g. National Cable Television Ass'n v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *Engine Mfrs. Ass'n v. Environmental Protection Agency,* 20 F.3d 1177 (D.C.Cir.1994). Not once has a court invalidated the general user fee statute as being an unconstitutional delegation of Congress's taxing power.

Furthermore, in this instance, Congress clearly intended to authorize fees of the type enacted by the Coast Guard's regulation. *See* H.R.Conf.Rep. No. 964, 101st Cong., 2d Sess. 1024, *reprinted in* 1990 U.S.C.C.A.N. 2728, 2729 ("Among the users that may be affected by user fees authorized under this section are persons who are issued certificates, permits, approvals, licenses, and documents by the Coast Guard.").

Although the Supreme Court has narrowed the meaning of the general user fee statute in order to avoid potential nondelegation problems, *National Cable Television Ass'n,* 415 U.S. at 340–41, 94 S.Ct. at 1148–49, such a narrowing addresses questions of statutory interpretation and does not directly implicate the constitutionality of the statute.

### B.

Plaintiffs also challenge the constitutionality of Section 2110(g), which gives the Secretary power to "exempt a person from paying a fee or charge established under this section if the Secretary determines that it is in the public interest to do so." 46 U.S.C. § 2110(g) (1994). Pursuant to this section, the promulgated regulations include a fee exemption for youth-oriented, not-for profit, charitable organizations involved in teaching maritime skills. 58 Fed.Reg. 15230 (1993).

Plaintiffs cite *National Cable Television Ass'n v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), to argue that the statutory language giving the Secretary discretion to determine the "public interest" violates the nondelegation doctrine. In *National Cable Television Ass'n,* the Supreme Court read narrowly the subsection of the general user fee statute that requires an agency to consider "public policy or interest served" as one of its factors in determining the actual fees. The Court avoided reading "public policy or interest served" literally. A finding that the agency had the power to consider public policy might have meant that the statute authorized agencies to impose a "tax" rather than a "fee," thus rendering the statute unconstitutional. *Id.* at 340–42, 94 S.Ct. at 1149–50 (citing *Schechter Corp. v. United States,* 295 U.S. 495, 529, 55 S.Ct. 837, 842–43, 79 L.Ed. 1570 (1935) and *Hampton & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928)).

■ In this case, however, the Coast Guard itself absorbed the costs of the no-fee licenses, Ad.Rec. 53, and the fees charged to plaintiffs are unaffected by the issuing of the no-fee licenses. Since plaintiffs cannot point to any harm caused by the Coast Guard's granting of fee exemptions, they do not have standing to challenge it. *See Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

### III.

■ Since the fee schedule is an agency rule promulgated pursuant to express statutory authority, the scope of review is limited.

The fees can only be invalidated if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) and (C). They must be upheld as long as they "were based upon a consideration of the relevant factors" and the Coast Guard did not commit "any clear errors of judgment." *Central & Southern Motor Freight Tariff Association v. United States,* 777 F.2d 722, 729 (D.C.Cir. 1985) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)).

First I consider whether the Coast Guard may charge for the licenses, certificates of registry or document at all; and if so, whether it may charge its full costs. Second, since I determine that the Coast Guard may charge for these documents, I address whether the Coast Guard properly calculated its costs.

### A.

■ The goal of the general user fee statute is to make services provided by an agency "self-sustaining to the extent possible." 31 U.S.C. § 9701(a).

"Under the [general user fee statute] an agency may impose a fee only for a service that confers a specific benefit upon an identifiable beneficiary." *Engine Manufacturers Ass'n v. Environmental Protection Agency,* 20 F.3d 1177, 1180 (D.C.Cir.1994) (citing *Federal Power Comm'n v. New England Power Co.,* 415 U.S. 345, 349, 94 S.Ct. 1151, 1154, 39 L.Ed.2d 383 (1974)). It is irrelevant if the service incidentally confers a benefit upon the general public as well. *Central & Southern Motor Freight Tariff Ass'n v. United States,* 777 F.2d 722, 732 (D.C.Cir.1985).

The general user fee statute also places three constraints on the magnitude of the fee charged. "First, the fee may not exceed the agency's cost of providing the service. Second, the fee must be reasonably related to and may not exceed the value of the service to the recipient, whatever the agency's costs may be. Finally, when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to the public benefit." *Central & Southern Motor Tariff Ass'n v. United States,* 777 F.2d 722, 729 (D.C.Cir.1985) (emphasis in original) (citations omitted). These three constraints are derived directly from the general user fee statute, which requires that each charge shall be fair and based on factors such as the costs to the Government, the value of the service to the recipient, the public policy or interest being served and other relevant facts. 31 U.S.C. § 9701(b)(1), (2)(A)–(D).

### 1.

■ For the bulk of the process through which the Coast Guard evaluates and examines an applicant and then issues the document, the private benefit to the individual is clear. The license, certificate or merchant marine document confers upon the individual the benefit of potential employment much as membership in a state bar does for lawyers or a license to practice medicine does for doctors. *See National Cable Television Ass'n v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974) (noting that a public agency that grants a license "to practice law or medicine or construct a house or run a broadcast station ... bestows a benefit on the applicant, not shared by other members of society"). It inherently enhances employment potential since the general public is excluded from employment in the industry. It further benefits other mariners by ensuring standards in the industry.

Plaintiffs have cited to an impressive array of historical materials to demonstrate that licensing has historically been intended to protect the government's ability to conduct waterborne commerce and shipping property interests. They point to more recent legislative history arguing that licensing also serves broader environmental concerns. Based on this wealth of legislative history, plaintiffs argue that the government's stated interests of individual employment benefits and safety for those in the industry are *post-hoc* rationales.

Despite these well-documented arguments, the interests articulated in the rule cannot be

presumed to be irrelevant. While the government's argument that licensing ensures standards in order to benefit fellow seamen may be questioned, its central contention that the license confers the benefit of professional employment is not irrational. A professional license for seaman is not materially different from a license for any number of professions. Licensing of all professionals clearly serves a broader public purpose, but plaintiffs have failed to articulate any independent public purpose that distinguishes a seaman's license from a doctor's or a lawyer's.

Furthermore, the Coast Guard has satisfied the statutory constraints on the magnitude of the fees.

■ First, according to the Coast Guard's figures, the fee charged does not exceed the cost of providing the service. The original cost to the agency was estimated at $6.5 million and the original fee total was estimated at $6.1 million. Between the Notice of Proposed Rulemaking and the final rule, the fee total was reduced by $900,000. Although it is unclear whether the entire reduction in the fee total reflects an equivalent reduction in the cost to the agency, the total cost exceeds the fee total by at least $428,000 according to the Coast Guard's figures. Ad. Rec. 53.

■ Second, the fee charged does not exceed the benefit conferred. The Coast Guard has demonstrated that the annual fee is insignificant when compared with the typical annual earnings of an applicant. 56 Fed. Reg. at 28452.

■ Plaintiffs argue that the Coast Guard impermissibly considered mariners' earnings, making the charges an unconstitutional "tax" rather than a "fee." The Coast Guard used the information about mariners' earnings to examine the potential financial impact upon individuals, not to set the actual fees. The Coast Guard is required to do this by the general user fee statute. There is no evidence that the fees were set or justified based on the earnings. Indeed, none of the fees vary based on the income of any individual recipient. *Cf. Electronic Industries Ass'n v. Federal Communications Commis-*

*sion,* 554 F.2d 1109, 1114–15 & n. 13 (D.C.Cir.1976) (tariff filing fees that increase with the revenues or profits of the payor invalid).

■ Third, licensing does not create an *independent* public benefit. Public benefits are incidental to, not independent of, the private benefits if the public benefits "are produced at no cost beyond that required to produce the private benefit." *Engine Mfrs. Ass'n v. Environmental Protection Agency,* 20 F.3d 1177, 1180 (D.C.Cir.1994) (citing *Central & Southern,* 777 F.2d at 732). Stated thusly, the constraint is little more than a restatement of the first constraint on the magnitude of the fee. If a public benefit has to have been produced at additional cost to the agency in order for it to be considered "independent," then presumably charging individuals for an "independent" public benefit is the same as charging them more than the agency's cost of providing the particular private benefit to the individual. *See Electronic Indus.,* 554 F.2d at 1115.

■ As noted above, plaintiffs contend that licensing creates several public benefits. Accepting the Coast Guard's figures, however, the public benefits described by plaintiffs are certainly not independent. Public benefits from licensing such as facility of waterborne commerce, protection of property and environmental interests do not come at an additional cost to the government. These benefits are a "necessary consequence" of licensing. *Central & Southern,* 777 F.2d at 732. Thus, the Coast Guard need not reduce the fees.

2.

Plaintiffs separately challenge the readily separable $17 fee for an FBI background check. They argue that the FBI check primarily benefits the public. The Coast Guard argues that the FBI check is used for the purposes of 46 U.S.C. § 7503. Section 7503 authorizes but does not require denial of any Coast Guard document to any individual who has been convicted of violating a dangerous drug law.

In contrast to the license itself, the FBI check does not confer a private benefit upon

the individual applicant. The reason the agency conducts the FBI check is primarily maritime safety. In *Electronic Indus. Ass'n v. Federal Communications Commission,* 554 F.2d 1109, 1115 (D.C.Cir.1976), the Court of Appeals cited safety as one example of an "independent" public benefit. "Although there may be some private benefit in safety testing, it is not part of the service the agency *must* render to the [applicant]." *Id.* (emphasis added). In *Electronic Indus. Ass'n,* the Court of Appeals noted that the Federal Communications Commission could charge for testing or inspection necessary to grant a piece of equipment approval, but could not charge for additional expenses if the Commission wished to test the equipment to see whether it met standards for consumer safety. The consumer safety described in *Electronic Indus. Ass'n* is indistinguishable in principle from the independent public benefit of safety that the FBI check provides.

 The Coast Guard argues that the safety of other seamen is the primary element of the safety concern; however, it points to no authority to support this contention. Furthermore, this argument flies in the face of common sense. While safety may also benefit other seamen, safety is a broader independent public benefit. The background check does not confer a private benefit on plaintiffs; hence, the statute does not authorize the Coast Guard to charge a fee for it. Thus, the accompanying Order grants plaintiff's Motion for Summary Judgment with respect to the FBI background check.

### B.

Since the fee charged may not exceed the agency's cost of providing the service, it is necessary to determine whether the Coast Guard rationally calculated its costs.

 On this question, the scope of review is narrow. As a general rule, it is reasonable for an agency to use pre-existing studies to determine its own costs rather than instituting a new study solely for the purpose of determining how much to charge. *See Central & Southern,* 777 F.2d at 736. Furthermore, the costs need not be calculated with "scientific precision." *Id.* (citing *National*

*Cable Television Ass'n v. Federal Communications Commission,* 554 F.2d 1094, 1105 (D.C.Cir.1976)).

 Nonetheless, despite this deference, the administrative record indicates that the data on which the Coast Guard relied is likely flawed. Based on the 1989 G–MP Workload Analysis Survey, the average number of person-hours spent in order to issue one document varied dramatically from one Regional Examination Center to another. The range was from 2.80 person-hours per document at the Houston Regional Examination Center to 27.01 person-hours per document at the Charleston Regional Examination Center. In other words, according to the Coast Guard's own figures, it takes more than nine times longer to issue a document in Charleston than it does in Houston.

Plaintiffs use these data to argue that the fees exaggerate the Coast Guard's actual costs. They argue that the individual Regional Examination Centers completed the surveys with an incentive to inflate the amount of time it takes to engage in tasks in order to be given more resources. There is insufficient evidence to decide whether plaintiffs' claim is correct; however, there is sufficient evidence to demonstrate that enough of the data relied upon by the Coast Guard are likely unreliable.

In light of the fact that the Coast Guard prescribes uniform guidelines for the issuance of marine documents, the disparities from one Regional Examination Center to another require further explanation. The number of documents issued is objectively verifiable, but the 1989 G–MP Workload Analysis Survey, on which defendants relied to determine the fees, is not sufficiently verified to establish the rationality of its calculations.

Defendants argue that comparing the hours it takes to issue a document at the different Regional Examination Centers fails to consider a variety of relevant factors such as the relative complexity of different documents, the completeness of individual applications, the experience of the clerk, management methods, working conditions etc. While such factors can lead to some variation from one Regional Examination Center to

another, they do not rationally account for disparities of the magnitude disclosed here.

The Coast Guard further notes that only the data on certificates of registry and merchant mariner's documents were compiled regionally, whereas the data on merchant marine licenses were compiled nationally without identifying the region of origin. Thus, the figures used by plaintiffs to demonstrate the disparities from region to region only measured the number of certificates of registry and merchant mariner documents and failed to consider the number of merchant marine licenses. While it is possible that this factor could reduce the disparities sufficiently to render the Coast Guard's data credible, this would be the case only if the Regional Examination Centers with significantly larger reported person-hours per document were issuing a relatively larger number of licenses. There is no indication in the record that this is the case. Based on the data in the record, it is just as likely that the wide disparities from one Regional Examination Center to another would be even wider when the number of licenses issued is taken into account.

Without further explanation of the enormous disparities in the time spent on licensing tasks in the various Regional Examination Centers, defendants' Motion for Summary Judgment must be denied.

Thus, an accompanying Order remands this case to the Coast Guard for recalculation of the costs of its licensing and documenting activities in accordance with this opinion and to reassess its fees accordingly. Since the Coast Guard reviews its fees annually, 58 Fed.Reg. at 15231, its review should include a recalculation of its costs.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 23d day of November, 1994, hereby

ORDERED: that plaintiff's Motion for Summary Judgment should be, and is, GRANTED IN PART with respect to fees for FBI background checks; and it is further

ORDERED: that defendant should be, and is, prohibited from charging for FBI background checks to applicants for licenses, certificates of registry and merchant marine documents pursuant to Department of Transportation's Final Rule dated March 19, 1993, 58 Fed.Reg. 15228; and it is further

ORDERED: that plaintiff's Motion for Summary Judgment should be, and is, DENIED IN PART with respect to all other fees for licenses, certificates of registry and merchant marine documents; and it is further

ORDERED: that defendant's Motion for Summary Judgment should be, and is, DENIED; and it is further

ORDERED: that this matter is remanded to the Coast Guard to recalculate the costs of its licensing and documenting activities in accordance with this opinion and to reassess its fees accordingly; and it is further

ORDERED: that the Coast Guard's recalculations shall be subject to notice and comment.