**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA et al., Appellants/Cross–Appellees,**

v.

**UNITED STATES COAST GUARD et al., Appellees/Cross–Appellants.**

Nos. 95–5016, 95–5017.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1995.

Decided April 12, 1996.

David E. Frulla, Washington, DC, argued the cause for appellants/cross-appellees, with whom Stanley M. Brand was on the briefs.

Frank A. Rosenfeld, Washington, DC, United States Department of Justice, argued the cause for appellees/cross-appellants, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and William G. Kanter, Deputy Director, were on the briefs. Alfred Mollin, Senior Counsel, entered an appearance.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Separate opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

HARRY T. EDWARDS, Chief Judge:

This case arises out of the Coast Guard's establishment of fees for maritime licensing, certification of registry, and merchant mariner documentation. In 1990, with the passage of section 10,401 of the Omnibus Budget Reconciliation Act of 1990 ("OBRA 1990"), Pub.L. No. 101–508, 104 Stat. 1388–397 (Nov. 5, 1990) (codified as amended at 46 U.S.C. § 2110(a) (Supp. IV 1992)), Congress authorized the Coast Guard to collect "user" fees, so long as any such fees were collected in accordance with the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701 (1988).[1] A coalition of unions now challenges the fee schedule, arguing that the Coast Guard has no statutory authorization to impose the particular fees in question.

■ The Supreme Court has made it clear that, as a general matter, a person who seeks to obtain an occupational license may be charged a fee to reimburse the licensing agency for the cost of processing the license. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1148–49, 39 L.Ed.2d 370 (1974) (*"NCTA"*). The only question we face, therefore, is whether the actual licensing scheme adopted by the Coast Guard is reasonably necessary to fulfill the substantive demands underlying the licensing process authorized by OBRA 1990 and related statutes. If so, then, under the IOAA, the agency may charge the applicant a fee to process the license. If not, a user fee is impermissible.

Under this test, we hold that the bulk of the fees being challenged by the unions are permissible under the IOAA, and we therefore affirm the District Court's finding to that effect. However, we reverse the trial judge's ruling that the Coast Guard cannot charge a first-time applicant a fee to perform a Federal Bureau of Investigation ("FBI") background check, because we find that the agency is statutorily required to determine whether an applicant has a disqualifying criminal record. Therefore, to the extent that the FBI check is limited to the criminal history of the applicant, the fee is permissible. Nevertheless, we remand on this question so that the District Court can determine whether the actual check performed by the FBI sweeps more broadly than is required by the underlying statute, thereby rendering part of the fee excessive.

## I. BACKGROUND

### A. The Statutory Scheme

The Coast Guard is authorized by statute to issue merchant mariner licenses, certificates of registry, or merchant mariner documentation (depending on the specific job classification) to qualified individuals seeking to work aboard a United States merchant marine vessel. *See generally* 46 U.S.C. Subtitle II, Part E (1988). These documents serve as occupational licenses, because an individual must possess one to work in the merchant marine.

The Coast Guard began charging fees for issuing the documents in question following the passage of OBRA 1990, which authorized the Coast Guard to establish user fees in accordance with the IOAA. Originally passed in 1951, the IOAA directs that "[t]he head of each agency ... may prescribe regulations establishing the charge for a service or thing of value provided by the agency." 31 U.S.C. § 9701(b) (1988). The only limitations on the fees are that they be "fair," and based on "(A) the costs to the Government; (B) the value of the service or thing to the recipient; (C) public policy or interest served; and (D) other relevant facts." *Id.*

### B. The Fee Structure

On June 20, 1991, the Coast Guard issued a Notice of Proposed Rulemaking ("NPRM") to establish fees for the issuance of merchant mariner licenses, certificates of registry, and merchant mariner documents. 56 Fed.Reg. 28,448. The NPRM proposed a fee schedule based on the three phases of the licensing process: (1) an evaluation fee (covering the cost of processing and evaluating the application); (2) an examination fee (covering the cost of scheduling, proctoring, and grading examinations and then notifying examinees of the test results); and (3) an issuance fee (covering the cost of issuing original, duplicate, or replacement licenses, certificates, or

---

1. The IOAA is the statute that generally governs user fees collected by the federal government.

documents). In addition, the Coast Guard proposed to charge all first-time applicants a $17 fee to cover the cost of an FBI criminal record check.

On March 19, 1993, the Coast Guard issued a final rule entitled "User Fees for Marine Licensing, Certification of Registry and Merchant Mariner Documentation." 58 Fed.Reg. 15,228 (codified in scattered sections of 46 C.F.R. (1993)). While revising some of the fees downward, the final rule retained the fee schedule essentially intact.

### C. The District Court's Decision

On April 15, 1993, a coalition of United States maritime labor organizations and individual merchant seamen and boatmen filed this action challenging the final rule imposing the fees. Subsequently, both parties filed cross-motions for summary judgment. On November 23, 1994, the District Court denied the Government's motion for summary judgment, and granted the unions' motion for summary judgment in part and denied it in part. *Seafarers Int'l Union v. United States Coast Guard*, 871 F.Supp. 9 (D.D.C.1994).

The District Court rejected the unions' claim that the Coast Guard has no authority under the IOAA and OBRA 1990 to assess *any* fees for its licensing and documentation services. The unions had argued that the fees were impermissible under the IOAA because they primarily benefitted the public rather than the regulated individuals or entities. While acknowledging the "impressive array of historical materials" indicating that the purpose of merchant mariner licensing is to protect various public interests, the District Court nevertheless determined that the Coast Guard's "central contention that the license confers the benefit of professional employment is not irrational." *Id.* at 15–16. Therefore, the court ruled that the Coast Guard had established a private benefit sufficient to justify the fees.

The District Court did, however, grant the unions' motion for summary judgment with respect to the required FBI background check. The court found that, "[i]n contrast to the license itself, the FBI check does not confer a private benefit upon the individual applicant. The reason the agency conducts the FBI check is primarily maritime safety." *Id.* at 16–17. Accordingly, the court prohibited the Coast Guard from charging applicants for the background checks.[2]

### II. Analysis

■ The IOAA itself provides little specific direction on how to assess the propriety of user fees. However, the Supreme Court long ago set forth the considerations that control agency determinations to assess fees for Government services:

> Taxation is a legislative function, and Congress, which is the sole organ for levying taxes, may act arbitrarily and disregard benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society. It would be ... a sharp break with our traditions to conclude that Congress had bestowed on a federal agency the taxing power.... A "fee" connotes a "benefit" and the [IOAA] by its use of the standard "value to the recipient" carries that connotation.

*NCTA*, 415 U.S. at 340–41, 94 S.Ct. at 1149 (footnote omitted). As is obvious from the foregoing quotation, the Court in *NCTA* carefully distinguished between a permissible *user fee* and an unconstitutional *tax*. In so doing, the Court made it clear that a user fee

---

2. In addition, the District Court denied the Government's motion for summary judgment, because it found that the record showed a likelihood that the data the Coast Guard used to calculate its overall costs was flawed. Therefore, the court remanded the case to the Coast Guard so that the agency could recalculate its costs,

subject to a new notice and comment period. The Government does not appeal the remand order. Despite the remand, this court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) (1994), because the District Court denied the unions' request for a preliminary and permanent injunction.

will be justified under the IOAA if there is a sufficient nexus between the agency service for which the fee is charged and the individuals who are assessed.

■ This same analytical framework, focusing on the value of the service to the recipient, was adopted by the Court in a companion case decided the same day, *Federal Power Commission v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974) ("*NEPCO*"). There the Court held that fees are valid so long as the agency levies "specific charges for specific services to specific individuals or companies." *Id.* at 349, 94 S.Ct. at 1154. Under this test, it does not matter whether the ultimate purpose of the regulatory scheme giving rise to the license requirement (and accompanying user fee) is to benefit the public. Indeed, the Supreme Court in *NCTA* rightly recognized that a regulatory scheme would be a "failure" if some benefits did *not* ultimately inure to the public. *NCTA*, 415 U.S. at 343, 94 S.Ct. at 1150.

■ Although the Court's rulings in *NCTA* and *NEPCO* broadly permit user fees in connection with the provision of specific services, the Court was careful to caution against a literal reading of the IOAA, which, by its terms, also permits fees based on "public policy or interest served." 31 U.S.C. § 9701(b)(2)(C). Such policy decisions, whereby an agency could, for example, adjust assessments to encourage or discourage a particular activity, would, according to the Court, "carr[y] an agency far from its customary orbit" and infringe on Congress's exclusive power to levy taxes. *NCTA*, 415 U.S. at 341, 94 S.Ct. at 1149. In particular, the Court in *NEPCO* made it absolutely clear that an agency could not assess fees, purportedly in the "public interest," to recoup some of the general costs to the Government of operating a particular regulatory scheme. On this point, the Court said:

> if we are to construe the [IOAA] to cover only "fees" and not "taxes"—as we held should be done in the *National Cable Television* case, *ante*, p. [415 U.S.] 336 [94 S.Ct. 1146]—the "fee" presupposes an application whether by a single company or by a group of companies. The Office of

Management and Budget (then known as the Bureau of the Budget) issued a circular in 1959 construing the Act. That circular stated that a reasonable charge "should be made to each *identifiable recipient* for a measurable unit or amount of Government service or property from which he derives a special benefit." (Emphasis added). The circular also states that no charge should be made for services rendered, "when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public."

We believe that is the proper construction of the Act. *NEPCO*, 415 U.S. at 349–51, 94 S.Ct. at 1154–55 (footnotes omitted). Accordingly, the Court made "value to the recipient" the measure of any fees imposed under the IOAA and essentially read the "public policy or interest served" language out of the statute. *See NCTA*, 415 U.S. at 341–43, 94 S.Ct. at 1149–50. Thus, fees cannot be charged based on a perceived furthering of public policy goals if those fees are unrelated to a specific service provided by the agency to an identifiable recipient.

■ Unfortunately, in applying this Supreme Court precedent, we have sometimes faltered in offering reformulations of the Court's test. In *Electronic Industries Ass'n v. FCC*, 554 F.2d 1109 (D.C.Cir.1976), this court stated that "[e]xpenses incurred [by the agency] to serve some *independent* public interest cannot, under *NCTA*, be included in the cost basis for a fee, although the [agency] is not prohibited from charging an applicant or grantee the full cost of services rendered to an applicant which also result in some incidental public benefits." *Id.* at 1115. This statement is consistent with the Supreme Court's ruling that user fees must be based on the cost of providing actual services without regard to any *incidental* public benefits that flow from, say, a licensing scheme. The court's purported distinction between "independent public interests" and "incidental public benefits," reflects a slight variation on the Supreme Court's test, but the decision

in *Electronic Industries* is otherwise faithful to *NCTA* and *NEPCO*.[3]

■ Although the court in *Electronic Industries* applied the Supreme Court's test correctly, it also reformulated the Court's language in *NCTA* "to require a certain nexus, a threshold level of private benefit, between the regulatee and the agency before a fee can be assessed against the recipient of the service." *Id.* at 1114. The notion of a "private benefit," first employed in *Electronic Industries*, was then expanded in *Central & Southern Motor Freight Tariff Ass'n v. United States*, 777 F.2d 722 (D.C.Cir.1985), where the court said:

> As a general matter, an agency may charge a fee for a *specific* service that confers a special, "private benefit" on an *identifiable* beneficiary. *See New England Power, supra*, 415 U.S. at 349, 94 S.Ct. at 1154 (quoting with approval Circular A–25).

777 F.2d at 729. The problem with this statement of the test is that it suggests that a specific service to an identifiable beneficiary can form the basis for a fee *only* if the service confers such a private benefit. This idea finds no support in either *NCTA* or *NEPCO;* indeed, neither decision even refers to "private benefits."

The further problem raised by *Central & Southern* is that, because of the misguided reference to "private benefits," the decision can be misread to mean that an agency must *weigh* "public" versus "private" benefits in determining whether and in what amount to charge fees. That is exactly what the parties have done in this case.

■ Both parties have expended considerable energy trying to persuade the court that the public benefits derived from the licensing scheme are weightier than the private benefits, or vice-versa. The plaintiff unions argue persuasively that merchant mariner licensing, from its inception, has been designed to further public goals: to ensure passenger safety on the water, to provide a convenient

list of available draftees in time of war, and, more recently, to combat the possibility that unqualified crew members could cause environmental harms. *See generally* Brief of Appellants/Cross–Appellees at 26–34. On the other hand, the Coast Guard contends, also quite reasonably, that the licenses, certificates, and documentation that can be obtained under the licensing regime provide a private employment benefit by enabling the recipient to hold specific jobs not open to the public at large. However, given the importance of both the public and the private interests at stake, it is pointless for a court to inquire which set of interests predominate. Weighing "public" versus "private" benefits is not what the Supreme Court intended in *NCTA* and *NEPCO*.

There is another point that the parties seem to miss: neither Congress nor an administrative agency cou'd legitimately institute a licensing process were it *not* deemed to be in the "public interest." Given this fact, it is nonsensical to attempt to weigh the public versus private benefits of receiving the license. No license would even be necessary (or justified) were it not for the public benefits that prompted the licensing requirement in the first place. Indeed, as a philosophical matter, *"private* benefits" (as distinguished from *"public* benefits") has no real meaning in this context. This was highlighted in *Mississippi Power & Light Co. v. NRC*, 601 F.2d 223 (5th Cir.1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980), where the court said that it was "not impressed by the petitioners' argument that they [should not be required to pay a license fee because they] receive no benefit from conferral of [a] license." *Id.* at 229. To accept such an argument, the court said, "would mean that *no* federal agency could assess any fees, since all public agencies are constituted in the public interest." *Id.* In other words, arguments about the presence or absence of "private benefits" go nowhere. That is why the IOAA and the Supreme Court in *NCTA* and *NEPCO* focus, instead, on *identifiable recipients* of a government

---

**3.** The court also applied the Supreme Court's test correctly in a companion case decided the same day. *See National Cable Television Ass'n v. FCC*, 554 F.2d 1094, 1104 (D.C.Cir.1976) ("[W]e find

no fault with the idea that a fee may be charged for an activity ... despite the fact that the general public secondarily benefits from it.").

service for which charges are being assessed, without regard to whether the services are perceived by the recipient to be personally beneficial. In short, the measure of fees is the cost to the government of providing the service, not the intrinsic value of the service to the recipient.[4]

Thus, we do not believe the distinction between private and public benefits is useful to the resolution of this case, nor do we find that such a distinction is mandated by the Supreme Court's decisions in *NCTA* and *NEPCO*. Although the Court indicated that an agency can charge fees only for those services conferred upon an identifiable recipient, *see NCTA*, 415 U.S. at 343, 94 S.Ct. at 1150, this requirement does not entail determining whether the private benefits of those services outweigh their public benefits. Rather, the Court in *NCTA* and *NEPCO* was only concerned that agencies might assess fees that would be unmoored to actual services. Because there is no question here that the Coast Guard is performing specific services to identifiable recipients, this concern is not applicable.

Furthermore, the dissent's suggestion that we are "rewriting" circuit precedent is entirely unwarranted. Our approach is absolutely consistent, not only with the Supreme Court's formulations, but also this court's most recent IOAA decision, *Engine Manufacturers Ass'n v. EPA*, 20 F.3d 1177 (D.C.Cir.1994). In that case, the court made passing reference to "private benefits," but nevertheless relied only on the correct test: "If the agency does confer a specific benefit upon an identifiable beneficiary ... then it is of no moment that the service may incidentally confer a benefit upon the general public as well." *Id.* at 1180. In short, the notion of "private benefits" had no bearing whatsoever on the court's ultimate resolution of the case. This is the law, and we follow it.

 Notwithstanding any confusion that may have been introduced with this court's (possibly inadvertent) reference to "private benefits," the original formulation in *NCTA* and *NEPCO* continues to provide a sound basis upon which to rest principled decisions

in this area of the law. As a general matter, *a person who is lawfully required to obtain an occupational license may be charged a fee to reimburse the agency for the cost of processing the license. See NCTA*, 415 U.S. at 340–41, 94 S.Ct. at 1148–49. Therefore, a reviewing court, in deciding whether an agency may exact a fee in connection with a *particular* licensing scheme, need not pause to *weigh* the relative public and private interests underlying the scheme, but can instead turn to the relevant statute to determine the substantive requirements underlying the license. Then, the proper inquiry is whether the actual licensing procedures adopted by the agency are sufficiently related to the statutory criteria to justify assessing a fee. For example, if an agency is charged with ensuring that all those receiving licenses meet certain job-related eligibility criteria, the agency may exact a fee for administering any procedures reasonably necessary to ensure that those particular eligibility criteria have been met. *See Electronic Indus.*, 554 F.2d at 1115 (The court ruled that the FCC can assess fees because the regulatory services in question "are required by statute, and the FCC is entitled to charge for services which assist a person in complying with his statutory duties.").

Where Congress has specifically laid out the relevant eligibility criteria, the inquiry is relatively simple. For example, 46 U.S.C. § 7503(b)(1) (1988) authorizes the Coast Guard to deny documentation to any person who, "within 10 years before applying for the license, certificate, or document, has been convicted of violating a dangerous drug law of the United States or of a State." In addition, other statutory provisions generally permit the Coast Guard to "review the criminal record" of an individual who applies for a license, certificate, or document. *See* 46 U.S.C. §§ 7101(h), 7302(d) (Supp. IV 1992). Such specific grants of authority permit the Coast Guard to take reasonable steps to ensure that the particular requirements have been met; therefore, it is logical that the agency should also be permitted to charge the applicant a fee to recover the expense of

---

4. There is also an element of "fairness" that must be applied in assessing fees under the

IOAA. 31 U.S.C. § 9701(b)(1). We have no occasion to address that factor in this case.

whatever reasonable procedure is employed by the Coast Guard to comply with the statute. Thus, if the FBI background check at issue is strictly limited to ensuring compliance with statutory requirements, then the $17 fee can be assessed. If, however, the FBI check sweeps more broadly than the statutory authorization, then a question arises whether the full cost of the background check can be passed on to the applicant. This matter must be considered on remand.[5]

When Congress has authorized a license requirement, but has *not* specified the criteria for qualifications, the issue is more complicated. Then, the appropriate question is whether the fee charged is sufficiently related to the interests underlying the license requirement. In order to assess the general licensing and documentation fees in this case, for example, we can look to several statutory provisions setting forth qualifications for obtaining various licenses and documents. *See, e.g.,* 46 U.S.C. § 7101(e)(4) (1988) (This provision requires that certain licenses be issued only to a person who "demonstrates, to the satisfaction of the Secretary, that the applicant has the requisite general knowledge and skill to hold the license."). Given that these requirements are relatively broad, a reviewing court must examine the specific licensing and documentation procedures for which the fee is charged and determine whether they are reasonably related to the qualification at issue. Because nothing in the record indicates that the licensing scheme being challenged is unrelated to ensuring adherence to the qualifications that Congress established, we find that exacting a reasonable fee for those procedures is permissible under the IOAA.

The matter does not end here, however, for the Government apparently seeks to claim boundless authority under the IOAA.

At oral argument, in response to a hypothetical question, Government counsel asserted that the agency should be permitted to charge a fee for *any* procedures, such as the inspection of boats, so long as those procedures are conducted as part of the requirements for obtaining a license. The Government's contention is absurd, for the Supreme Court in *NCTA* and *NEPCO* made it clear that an agency cannot load on expenses in the guise of collecting licensing fees. The reason these costs cannot be passed on to license applicants is that boat inspections are not materially related to the requirements for a license established by Congress, which only address various personal qualifications of the applicant (not the seaworthiness of the boat on which he or she will work). *See* 46 U.S.C. § 7101 (1988 & Supp. III 1991). In other words, a user fee for license applicants is only permissible if the procedures in question are related to the qualifications set forth in the licensing statute.

Moreover, it should be clear that an agency is not free to add extra licensing procedures and then charge a user fee merely because the agency has general authority to regulate in a particular area. *Cf. Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 670 (D.C.Cir.1994) (en banc) (An agency does not "possess[ ] *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area."), *cert. denied,* —— U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). Thus, there must always be a statutory basis for any requirements giving rise to a fee.

## III. CONCLUSION

For the foregoing reasons, we hold that, in general, the Coast Guard is authorized to charge reasonable fees for the pro-

---

5. Our dissenting colleague argues that, because the Coast Guard's rule refers to the FBI check as a "criminal record check[ ]," *see* 58 Fed.Reg. 15,228, 15,231 (1993), the court should find, as a matter of law, that the FBI check sweeps no more broadly than the agency's statutory authorization. Such a conclusion misconceives our role as appellate judges. In this case, the District Court made no factual findings regarding the scope of the FBI check. Therefore, there is no basis for deciding whether the check is limited to what the statute requires. The rule promulgated by the Coast Guard *may* indicate that the FBI inquires only into the criminal record of each applicant. However, the District Court must determine, on remand, what the scope of the FBI check is, *in actual practice.* We simply cannot dispose of this question based on the vague language of the Coast Guard's regulations without any factual basis.

cessing of applications from persons seeking merchant mariner licenses, certificates, and documents to work aboard United States merchant marine vessels. In addition, the agency may charge a fee to cover the cost of an FBI investigation to determine whether an applicant has a disqualifying criminal record. However, we remand the case to allow the District Court to consider whether the FBI check sweeps more broadly than is required by the underlying statute, and, if so, whether the fee charged is excessive.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge,* concurring in the judgment in part and dissenting in part:

This case involves a challenge to the United States Coast Guard's adoption of a fee schedule to recover its expenses in granting merchant marine licenses, certificates of registry and merchant mariner documents. The district court concluded that the Coast Guard is authorized to charge certain fees for its licensing activities. The plaintiffs appeal this ruling and the majority affirms. The court further concluded, however, that the Coast Guard cannot charge a first-time applicant a fee for the cost of a criminal record check. The government cross-appeals this ruling and the majority reverses and remands.

I agree that the Coast Guard is authorized to collect all of the fees at issue. I disagree, however, with the majority in two respects. First, I would resolve the case in the usual way, that is, by applying circuit precedent. Second, I do not agree with the majority's remand on the scope of the FBI check. In my view a remand is unnecessary.

1. The Coast Guard issues licenses to masters, mates, engineers, pilots, operators and radio officers. 46 U.S.C. § 7101(c). Certificates of registry issue to pursers, medical doctors and professional nurses. *Id.* § 7101(f). Mariner documents issue to, among others, able seamen, members of engine departments, lifeboatmen and tankermen. *See generally id.* Subtitle II, Chapter 73.

2. Congress apparently intended to preclude the agency from charging a fee for a certificate of registry as well. *See* H.R.Rep. No. 98–338, 98th

## I. Background

The Coast Guard is authorized by statute to issue a merchant marine license, certificate of registry or merchant mariner document (depending on job classification) to a qualified individual seeking to work aboard a United States merchant marine vessel. *See generally* 46 U.S.C. Subtitle II, Part E.[1] The license, the certificate and the document all serve as occupational licenses because an individual must possess at least one to work in the merchant marine. Congress has left it largely to the Coast Guard to set the qualifications for the authorizations. *See, e.g.,* 46 U.S.C. § 7101(f).

Before 1990, Congress prohibited the Coast Guard from charging fees for a license to be a master, mate, pilot or engineer. *Id.* § 2110 (1990).[2] In the Omnibus Budget Reconciliation Act of 1990 (1990 Budget Act), Pub.L. No. 101–508, § 10401, 104 Stat. 1388–97 (Nov. 5, 1990), Congress reversed course. The 1990 Budget Act replaced section 2110 with a new section 2110 which *requires* the Coast Guard to charge a fee "for a service or thing of value" it provides under 46 U.S.C. Subtitle II. Congress intended to "permit the Coast Guard to collect a direct user fee for," among other things, "licensing, certification, and documentation of personnel." H.R.Conf.Rep. No. 964, 101st Cong., 2d Sess. 1023–24 (1990) ("the users that may be affected by user fees authorized under this section are persons who are issued certificates, permits, approvals, licenses, and documents by the Coast Guard"), *reprinted in* 1990 U.S.C.C.A.N. 2374, 2728–29. Section 2110 requires the Coast Guard to establish fees in accordance with the Independent Offices Appropriations Act (IOAA), 31 U.S.C. § 9701. The IOAA in turn authorizes a federal agency to collect a fee from the benefi-

Cong., 1st Sess. 133 (1983), *reprinted in* 1983 U.S.C.C.A.N. 924, 945. Although section 2110 as enacted did not include certificates within the prohibition, the Coast Guard did not charge a fee for issuing them. In addition, although section 2110 did not expressly apply to a merchant mariner document, the Coast Guard likewise did not charge a fee for documentation services before adopting the fee schedule at issue here. 56 Fed. Reg. 28,448 (June 20, 1991). In sum the Coast Guard imposed no licensure fees before the 1990 amendment to section 2110.

ciary of "each service or thing of value" the agency provides in order to make each "self-sustaining to the extent possible." *Id.* § 9701(a).

Shortly after the enactment of the 1990 Budget Act the Coast Guard first calculated fees based on its licensing costs. It then issued a notice of proposed rulemaking (NPRM). 56 Fed.Reg. 28,448 (June 20, 1991). The NPRM proposed a fee schedule reflecting the three phases of the licensing process: (1) an evaluation fee (cost of processing and evaluating application), (2) an examination fee (cost of scheduling, proctoring and grading examination and notifying examinee of test results) and (3) an issuance fee (cost of issuing original, duplicate or replacement license, certificate or document). Included as a separate fee for all first-time applicants was a $17 charge for a Federal Bureau of Investigation (FBI) criminal record check. On March 19, 1993 the Coast Guard issued a final rule which adopted the fee schedule in the NPRM with certain modifications not relevant here. 58 Fed.Reg. 15,-228 (March 19, 1993) (adjusting one examination fee and adding exemption for certain category of mariners) (codified at 46 C.F.R. §§ 10.109 and 12.02–18). The final rule declares that each recipient of a license, certificate or document receives a special benefit in that he "receives a credential that inherently enhances employment potential." 58 Fed. Reg. at 15,229.

On April 15, 1993 a coalition of U.S. maritime labor organizations and individual merchant seamen and boatmen filed this action challenging the final rule and seeking declaratory and injunctive relief. On cross-motions for summary judgment the district court granted the plaintiffs' motion in part and denied *in toto* the government's motion. *Seafarers Int'l Union v. United States Coast Guard,* 871 F.Supp. 9 (D.D.C.1994).

The district court denied the plaintiffs' summary judgment motion insofar as it asserted that the Coast Guard has no authority under the IOAA to assess any fees in connection with the grant of a license, certificate or document. The court held that these items confer on each recipient a special benefit of potential employment. *Id.* at 14–16. The

court further reasoned that, with the exception of the FBI criminal record check, the Coast Guard may charge the full cost of each licensing activity (evaluation, examination and issuance) and need not allocate any portion to the general public. *Id.* at 16.

The district court granted the plaintiffs' motion with respect to the one-time fee for the FBI criminal record check and enjoined the Coast Guard from collecting the fee, concluding that the criminal record check provides an independent public benefit and therefore its cost must be allocated to the public. *Id.* at 16–17. The government cross-appeals this ruling. We have jurisdiction to review both challenges under 28 U.S.C. § 1292(a)(1).

## II. Discussion

### A. The IOAA

This case calls on us to determine whether the Coast Guard's fee schedule comports with the IOAA, a statute the Supreme Court has interpreted "narrowly to avoid constitutional problems" regarding the delegation of Congress's taxing power. *See National Cable Television Ass'n, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1149–50, 39 L.Ed.2d 370 (1974) (*NCTA I* ); *Federal Power Comm'n v. New England Power Co.,* 415 U.S. 345, 351, 94 S.Ct. 1151, 1155, 39 L.Ed.2d 383 (1974); *see also Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 224, 109 S.Ct. 1726, 1733–34, 104 L.Ed.2d 250 (1989). "Under the IOAA an agency may impose a fee only for a service that confers a specific benefit upon an identifiable beneficiary." *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1180 (D.C.1994). "If the agency does confer a specific benefit upon an identifiable beneficiary, however, then it is of no moment that the service may incidentally confer a benefit upon the general public as well." *Id.* "[W]hether an agency must allocate a portion of its costs [to the public] depends not so much on the *magnitude* of the benefits to the public ... but rather on the *nature* of the public benefits and on their relationship to the private benefits produced by the agency action. What flows from this is the following principle: If the asserted public benefits are

the necessary consequence of the agency's provision of the relevant private benefits, then the public benefits are not independent, and the agency would therefore not need to allocate any costs to the public." *Central & Southern Motor Freight Tariff Ass'n, Inc. v. United States,* 777 F.2d 722, 731–32 (D.C.Cir. 1985) (emphasis in original). "If the service provides both a specific benefit to an identifiable beneficiary and an independent benefit to the public, then the agency must prorate its costs, lest the specific beneficiary be charged for agency costs attributable to the public benefit." *Engine Mfrs.,* 20 F.3d at 1180.[3]

The plaintiffs argue that the IOAA authorizes *none* of the Coast Guard's fees. I first address this argument and then discuss the criminal record check fee.

## B. Coast Guard's Fee Schedule (Minus FBI Criminal Record Check Fee)

The overarching issue is whether the Coast Guard's licensing activities confer a special, private benefit on the recipient of each license, certificate and document (as opposed to the public at large or the merchant marine industry as a whole) and, if so, whether the asserted public benefits that flow from the licensing program are a necessary consequence of the agency activities that produce the private benefit. The issue need not detain us long in light of "[t]his circuit's generous interpretation of the [IOAA]." *Ayuda, Inc. v. Attorney General,* 848 F.2d 1297, 1300 (D.C.Cir.1988).

First, it is clear that the Coast Guard's licensing program confers a special, private benefit on the recipient of a license, certificate or document. The Coast Guard's services "are triggered only at the instance of the individual who seeks, obviously, to benefit from them." *Id.* at 1301 (citing *NCTA I,* 415 U.S. at 340, 94 S.Ct. at 1149 ("[a] fee … is incident to a voluntary act")). The individual recipient benefits by receiving what is in effect an occupational license, a document that signifies he has satisfied applicable statutory and regulatory standards for a particular job classification and is authorized to work in the merchant marine.[4] Each license, certificate and document bestows a benefit of potential employment not enjoyed by members of the general public. Moreover, insofar as a mariner is statutorily required to possess such credentials, the Coast Guard's licensing service assists the mariner in complying with his statutory duties.[5] In short, "our prior cases teach unmistakenly that the phrase 'service or thing of value' is to be construed broadly," *id.* at 1300, and "fees for licenses and registrations" are "classic exam-

---

**3.** As we summed it up in *Central & Southern,* "These general principles … suggest that an agency may recover the full costs of providing a service when the following conditions are met: (1) the agency has identified the specific agency activity or activities for which the fee is being assessed; (2) the service produces a special, private benefit; (3) the value of that private benefit is reasonably related to the fee; (4) the benefit accrues at least in part to an identifiable private beneficiary and not merely to the industry as a whole; and (5) the service in question produces no independent public benefit." 777 F.2d at 730.

**4.** *See NCTA I,* 415 U.S. at 340, 94 S.Ct. at 1149 ("A fee … is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society."); *see also National Cable Television Ass'n, Inc. v. FCC (NCTA II),* 554 F.2d 1094, 1100–03 (D.C.Cir.1976) (FCC may charge fee for expenses incurred in granting certificate

of compliance to cable television operator, including cost of processing application for "necessary and therefore valuable license"); *cf. Engine Mfrs.,* 20 F.3d at 1180–81 (EPA testing of vehicles and engines for compliance with Clean Air Act's emissions standards confers private benefit because manufacturer's compliance certificate enables it to sell its products); *Allied–Signal, Inc. v. Nuclear Regulatory Comm'n,* 988 F.2d 146, 148 (D.C.Cir.1993) (IOAA phrase "service or thing of value" "includes, perhaps oxymoronically, 'regulatory services' such as permit processing"); *Electronic Indus. Ass'n v. FCC,* 554 F.2d 1109, 1115–16 (D.C.Cir.1976) (FCC testing and approval of equipment confers private benefit by giving manufacturer "credibility in the market place").

**5.** *Electronic Indus.,* 554 F.2d at 1115–16 (FCC can assess fees for (i) processing tariff filings and (ii) testing and approving equipment because "[b]oth activities are required by statute, and the FCC is entitled to charge for services which assist a person in complying with his statutory duties").

ples of user fees" authorized by the IOAA, *id.* at 1299.

Second, the asserted public benefits that flow from the licensing scheme—public safety, environmental protection and national defense—are not independent of the identified private benefit. To the extent the public benefits, as the plaintiffs urge, flow from the licensing scheme, they are the necessary consequence of the agency's provision of the private benefit and, more specifically, of the underlying statutory requirement that a licensed mariner must be qualified to perform the job he seeks. *See Central & Southern,* 777 F.2d at 732. Put another way, the Coast Guard cannot provide the private benefit without simultaneously providing the asserted public benefits, *see id.,* and the latter "are produced at no cost beyond that required to produce the private benefit," *Engine Mfrs.,* 20 F.3d at 1180.

Nevertheless the plaintiffs maintain that Congress designed the Coast Guard's licensing scheme *primarily* to benefit the general public. According to them, because Congress designed the licensing scheme primarily for the public benefit and the regime primarily benefits the public, the *full* costs of licensing must be allocated to the public so long as the asserted private benefit necessarily flows from the agency's provision of the public benefits. Their argument is flawed in several respects.

First, the plaintiffs' reliance on congressional intent strikes me as odd in view of the history of the challenged fees. The 1990 Budget Act repealed the prohibition on fees for licenses and, apparently, certificates of registry, *see supra* note 2, and *mandated* that the Coast Guard establish fees in accordance with the IOAA. The IOAA, which now authorizes an agency to charge a fee for "each service or thing of value provided," used to permit fees for, among other things, "*any ... document, ... license, permit, certificate, registration or similar thing of value or utility ... furnished, provided, granted, prepared, or issued*" by a federal agency. 31 U.S.C. § 9701, Explanatory Notes (noting

Congress substituted phrase "each service or thing of value" in place of highlighted phrase "for consistency and to eliminate unnecessary words") (emphasis added).

Second, the plaintiffs misread our IOAA cases. The cases focus not on the purpose of the underlying statutory scheme but instead on whether the particular agency activities underlying a fee have the effect of conferring a special benefit on an identifiable beneficiary. For example, in *Engine Manufacturers* the EPA's vehicle and engine testing regime was designed to comply with the Clean Air Act's emissions standards which were themselves imposed to benefit the public by ensuring cleaner air. 20 F.3d at 1180. But the EPA's testing regime also provided a service and benefit to manufacturers by enabling them to comply with the statute and sell their products. And in *Electronic Industries* we noted that the statute at issue there "was *clearly* enacted to remedy rate discrimination," 554 F.2d at 1115 n. 16 (emphasis added), which benefitted the public. We said, however, that "[a]lthough this statute was enacted in order to protect the public against excessive or unreasonably discriminating or preferential charges, that result is only an incidental benefit from the *service* which is rendered by the agency, *i.e.,* assisting the carriers in complying with the statute." *Id.* at 1115 (footnote omitted). In fact, *Electronic Industries* laid to rest any notion that an agency "should be limited to charging fees for those services where the benefit to the private party is greater than the benefit to the public...." *Id.* 1114 n. 12.

The plaintiffs' proposed approach—which would have us determine, first, whether the enabling statute or agency activity underlying a fee has the primary purpose or effect of benefitting the general public and, then, whether the private benefit necessarily flows from the provision of the public benefit (instead of *vice versa*)—fails to fully take into account that all government action is presumed to be undertaken for the public benefit.[6] Consequently, in reviewing the validity

---

6. *Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Comm'n,* 601 F.2d 223 (5th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1066, 62

L.Ed.2d 787 (1980), is directly on point. At issue there was an NRC licensing fee schedule designed to recover costs for processing applica-

of a fee under the IOAA, we focus instead on whether an identifiable beneficiary derives a special .benefit apart from the benefit bestowed on the public. "Where a service (or privilege) provides special benefits to an identifiable recipient *above and beyond those which accrue to the public at large,* a charge should be imposed to recover the full cost to the Federal Government of rendering that service." Bureau of Budget (now Office of Management and Budget) Circular No. A–25 (Sept. 23, 1959) (emphasis added), *cited with approval in New England Power,* 415 U.S. at 349–51, 94 S.Ct. at 1154–55.[7]

I conclude that the Coast Guard may, consistent with the IOAA, charge a fee to recover the full costs reasonably incurred in issuing a marine license, a certificate of registry and a merchant mariner document, including the costs associated with evaluating an application and examining an applicant. I turn now to the discrete criminal record check fee.

### C. Coast Guard's Criminal Record Check Fee

As part of its licensing process the Coast Guard requests the FBI to conduct a criminal record check on each first-time applicant. The Coast Guard obtains the applicant's fingerprints and sends a fingerprint card to the FBI which in turn checks the fingerprints against criminal records retained by law enforcement and other government agencies. 58 Fed.Reg. at 15,231; 46 C.F.R. § 10.205(f). The FBI charges the Coast Guard $17 for each check. The Coast Guard in turn includes in its fee schedule a separate $17 fee for each first-time applicant. . The district court held that "[i]n contrast to the license itself, the FBI check does not confer a private benefit upon the individual applicant" but instead an independent public benefit related to maritime safety. *Seafarers Int'l Union,* 871 F.Supp. at 16–17. The court thus enjoined the agency from charging the fee. I would reverse but not remand.

Congress authorizes the Coast Guard to deny a marine license, a certificate of registry or a merchant mariner document to an applicant who "within 10 years before applying for the license, certificate, or document, has been convicted of violating a dangerous drug law of the United States or of a State." 46 U.S.C. § 7503(b)(1). *See* 46 C.F.R. § 10.201(b) (applicant with drug conviction within 3 years of filing application is ineligible for license or certificate; period may be

tions, permits and licenses, conducting health and safety inspections and antitrust reviews and preparing environmental impact statements. The licensees argued that the NRC lacked authority under the IOAA to charge fees because the NRC's activities benefitted the general public. *Id.* at 227–29. The Fifth Circuit rejected the argument and noted, "A license from the NRC is an absolute prerequisite to operating a nuclear facility, and as such, is a benefit not shared by other members of society.... [T]o accept petitioners' argument would mean that *no* federal agency could assess any fees, since all public agencies are constituted in the public interest." *Id.* at 229 (internal quotation marks and footnote omitted). *See also Phillips Petroleum Co. v. Federal Energy Regulatory Comm'n,* 786 F.2d 370, 375–78 (10th Cir.1986) (rejecting argument that because Natural Gas Act and Natural Gas Policy Act "were enacted with the primary purpose of benefiting the public," FERC could not charge fees for services performed thereunder (*e.g.,* issuing certificates) which "enable the [regulated entities] to engage in their respective activities or to comply with the [statutes]"); *cf. NCTA I,* 415 U.S. at 341, 94 S.Ct. at 1149 ("There is no doubt that the main function of the Commission is to safeguard the public interest in the broadcasting activities of members of the industry.").

7. Contrary to the plaintiffs' assertion, Budget Circular A–25 does not support them. Although the Circular states "[n]o charge should be made for services when the identification of the ultimate beneficiary is obscure *and* the service can be *primarily* considered as benefitting broadly the general public" (emphasis added), the plaintiffs pay short shrift both to the conjunction and to the prefatory phrase: an agency should not charge fees if *the ultimate beneficiary is obscure* and (therefore) the service can be primarily considered as benefitting the public. Here the beneficiary of a license, certificate or document—the recipient—is not obscure. Indeed, the plaintiffs ignore other significant language from the Circular: ·"[A] special benefit will be considered to accrue and a charge should be imposed when a Government-rendered service: (a) Enables the beneficiary to obtain more immediate or substantial gains or values ... than those which accrue to the general public (*e.g.,* receiving ... a license to carry on a specific business); or (b) ... [A]ssures public confidence in the business activity of the beneficiary ...; or (c) Is performed at the request of the recipient and is above and beyond the services regularly received by ... the general public...." *New England Power,* 415 U.S. at 350 n. 3, 94 S.Ct. at 1154 n. 3.

extended up to 10 years if warranted); *id.* § 12.02–4 (document presumptively will not issue to applicant with drug conviction within 10 years of filing application). In addition, Congress authorizes the Coast Guard to "review the criminal record" of an individual who applies for a license, certificate or document. 46 U.S.C. §§ 7101(h), 7302(d); *cf. also id.* § 7101(c), (f) (Coast Guard may issue license or certificate if applicant is "qualified as to character"). In short, Congress plainly contemplated a criminal record check as part of the licensing process and the Coast Guard uses the results of the record check to determine whether to grant a license, certificate or document.

Viewed in this light, a "clean" criminal record is simply one of several relevant qualifications for obtaining a license, certificate or document and the criminal record check is an integral part of the licensing scheme. The criminal record check is not unlike the drug test required of, and paid for by, an applicant as part of his physical examination. *See id.* §§ 7101(i), 7302(e); 46 C.F.R. § 16.220. The record check is also similar to the agency's examination of an applicant's knowledge: both inquiries are authorized by Congress and are designed to ensure that the applicant is qualified. Furthermore, *Electronic Industries,* relied on by the district court, does not dictate invalidation of the fee but instead points to the opposite result. One of the fees at issue there was designed to cover the cost of an agency hearing held in connection with various FCC permits and operating licenses. The petitioners argued that a hearing was "not a 'benefit' but a hurdle the applicant must surmount before obtaining his license or permit." 554 F.2d at 1117 n. 17. We rejected the argument and explained:

The statutes [requiring permits and licenses], however, each contemplate a hearing as part of the process of issuing the license or permit. Although the applicant might prefer to dispense with the hearing, it is as integral a part of the procedure which is set in motion by the application, as is the mechanical handling of the paper (which one might also choose to eliminate in the interest of saving money). The agency is not limited to charging for activities that are beneficial to an applicant, but can include in its fee the cost of any service that is necessarily rendered to him.

*Id.* Likewise here: the maritime statutes contemplate a criminal record check as part of the process of issuing a license, certificate or document.[8]

Of course an agency may not, in an effort to offset the cost of regulating generally, conveniently toss into its licensing fee schedule *any* expense it incurs in the course of regulating a license applicant or the applicant's industry. Rather, in the context of an occupational or operating license, each agency activity underlying a fee must be reasonably related to determining whether the license applicant satisfies the standards or qualifications for obtaining a license. An agency may not "load upon" an applicant expenses which are "only tangentially related" to assessing and ensuring the applicant's qualifications. *NCTA II,* 554 F.2d at 1104.

In this connection the majority orders a remand to allow the district court to consider whether the FBI conducts more than a criminal record check—*i.e.,* a general background check. But assuming *arguendo* that the Coast Guard may not lawfully charge an applicant a fee for a general background check, a remand is a waste of time because it

---

**8.** The fact that Congress authorizes but does not require a criminal record check is a distinction without a difference. *See Engine Mfrs., supra.* One of the fees at issue in *Engine Manufacturers* was a charge for the cost of an EPA selective enforcement audit whereby the EPA tested an individual vehicle or engine randomly taken from a manufacturer's assembly line; if it did not meet emissions standards, the EPA could suspend or revoke the manufacturer's certificate. The audits were not required by statute. Rather, Congress authorized the agency to test a certified manufacturer's vehicles or engines, 42 U.S.C. § 7525(b)(1), and to suspend or revoke the manufacturer's certificate in the event testing revealed noncompliance, *id.* § 7525(b)(2)(A)(i). Manufacturers argued that the audit was an enforcement measure, benefitted only the public and was unrelated to the private benefit conferred on them by the certification process. We upheld the fee under the IOAA because we found the audit to be an "integral part[ ] of the compliance regime to which a manufacturer submits when it first applies for a certificate." 20 F.3d at 1180.

is plain that the FBI performs no more than a criminal record check. In the notice of proposed rulemaking and final rule under review, the Coast Guard described the FBI's activity as a "criminal record check," not a general background check. 56 Fed.Reg. 26,-448, 28,450 (1991); 58 Fed.Reg. 15,228, 15,-231 (1993). In the final rule the Coast Guard explained:

> [D]uring the application process ... the Coast Guard checks the applicant's fingerprints against records of law enforcement and other government agencies. This process involves sending the applicant's fingerprint card to the FBI. To complete this portion of the background check, the FBI charges the Coast Guard $17 for each fingerprint card. Approximately 16,000 FBI criminal record checks are conducted on applicants each year....

*Id.* Because it is clear that the FBI simply does a criminal record check and the plaintiffs have not argued otherwise, I would not remand.

* * * * * *

As I have just demonstrated, this case is easily resolved under our case law, which I am bound to follow. The majority, however, wishes to rewrite it. In particular, the majority takes to task the *Central & Southern* panel for its proposition that, under the IOAA, "an agency may charge a fee for a *specific* service that confers a special, 'private benefit' on an *identifiable* beneficiary." *See* Majority Opinion (Maj. Op.) at 184 (quoting *Central & Southern,* 777 F.2d at 729) (emphasis in *Central & Southern*). According to the majority, "The problem with this statement of the test is that it suggests that a specific service to an identifiable beneficiary can form the basis for a fee *only* if the service confers such a private benefit. This idea finds no support in either [*NCTA I*] or [*New England Power*]; indeed, neither decision even refers to 'private benefits.'" *Id.*

To the extent the majority suggests that the concept of "private benefit" popped up out of nowhere and departs from *NCTA I* and *New England Power,* I cannot agree. In *NCTA I* the Court decided that a fee "is incident to a voluntary act"—that is, the regulated entity asks an agency to provide it

with something of value—and an agency "normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society." 415 U.S. at 340–41, 94 S.Ct. at 1148–49; *see id.* at 343, 94 S.Ct. at 1150 (contrasting regulated entity's "special benefits" with agency costs that "inured to the benefit of the public"). The Court then emphasized, "A 'fee' connotes a 'benefit' and the [IOAA] by its use of the standard 'value to the recipient' carries that connotation." *Id.* at 341, 94 S.Ct. at 1149. Moreover, in *New England Power* the Court quoted with approval from Budget Circular A-25, *supra,* which states that an agency may recover the full cost of providing "special benefits to an identifiable recipient above and beyond those which accrue to the public at large...." *Id.* at 349–50 n. 3, 94 S.Ct. at 1154 n. 3; *NCTA II,* 554 F.2d at 1097 n. 8 (quoting Budget Circular A-25).

In any event, the majority, it appears, is not satisfied with the "private benefit" language for two reasons. First, the phrase "suggests that a specific service to an identifiable beneficiary can form the basis for a fee *only* if the service confers such a private benefit." Maj. Op. at 184. In other words, the majority expresses concern that a regulated entity could take the position that, despite the fact that an agency provides a specific service to an identifiable beneficiary, the agency does not in fact confer a "private benefit." Apparently the majority is troubled that "private benefit" might be construed to mean that the recipient must perceive the agency's service to be personally beneficial. *Id.* at 185. But our circuit has construed "private benefit" so broadly that that argument cannot legitimately be made. In *Electronic Industries,* for example, we upheld an FCC fee for processing a tariff filing. *See supra* note 5. We reasoned that the FCC conferred a "private benefit" by simply assisting common carriers in complying with a statute that was enacted to protect the public against excessive, unreasonably discriminatory or preferential charges. 554 F.2d at 1115–16. And in *Engine Manufacturers* we held that the EPA confers a "private benefit" when it subjects a manufac-

turer to in-use compliance testing and enforcement audits because those services are integral to the agency's task of ensuring that the manufacturer complies with the Clean Air Act. 20 F.3d at 1180 (holding that "[t]he private benefit conferred ... is specific to the manufacturer" and that "[t]he public benefits associated with cleaner air are incidental to, not independent of, that private benefit").

Second, the majority worries that "private benefit" might erroneously "be misread to mean that an agency must *weigh* 'public' versus 'private' benefits in determining whether and in what amount to charge fees." Maj. Op. at 184. The majority's fear is borne out, we are told, because "[t]hat is exactly what the parties have done in this case." *Id.* at 184. But that is not what "the parties" have done in this case; it is what *the plaintiffs* have done in this case. Neither in the final rule nor in its brief on appeal has the Coast Guard contended it can charge fees on the ground that the licensing scheme primarily benefits mariners. As a matter of fact, in response to the plaintiffs' "weighing" argument, the agency properly relies on *Central & Southern* and argues that "this Court need not engage in the impossible task of somehow determining whether the public benefits that result from the licensing program are more important than the private benefits, or served Congress's primary motivation." Brief of Appellees/Cross–Appellants at 40.

While the majority blames the *Central & Southern* panel for the weighing argument, it neglects to point out that the plaintiffs rely primarily on the Supreme Court's *New England Power* decision, in particular the Court's approval of Budget Circular A–25, the Bureau of Budget's official interpretation of the IOAA.[9] *See supra* note 7. The Court stated, "The circular also states that no charge should be made for services rendered, 'when the identification of the ultimate beneficiary is obscure and *the service can be primarily considered as benefitting broadly the general public.*' We believe that is the proper construction of the Act." *New England Power,* 415 U.S. at 350–51, 94 S.Ct. at 1154 (quoting Budget Circular A–25) (emphasis added). This is the language the plaintiffs have put on display; Budget Circular A–25 is the majority's culprit.

In any event, the majority's concern—that *Central & Southern* can be misread to mean an agency must weigh public and private benefits in determining whether and in what amount to charge fees—is entirely unwarranted. First of all, as the Coast Guard points out, *Central & Southern* itself rejected a test (proposed by the petitioners there) whereby an agency could charge for the full cost of a service only if "the agency's service benefits the recipient primarily" and the public incidentally. *Central & Southern,* 777 F.2d at 731 ("the *magnitude* of the benefits to the public" is not the proper focus). Second, in *Electronic Industries* we *plainly* rejected the precise weighing test the plaintiffs would now have us adopt. There the FCC, on the heels of the *NCTA I* and *New England Power* decisions and in an attempt to apply the decisions to a proposed fee schedule, stated:

This Further Notice proposes a revised schedule of fees whereby only those activities that are specifically identified as primarily benefitting identifiable recipients will be included as costs in the fee program. The costs of those activities which either cannot be identified as specifically benefitting identifiable recipients, or which can be identified as primarily benefitting

---

9. The plaintiffs argue:
 [A]n agency may not charge a person or entity for a service that *primarily* benefits the public, even if that person or entity does benefit in some way from that agency action. The Supreme Court in *New England Power Co., NCTA I*'s companion case, confirmed the former Bureau of Budget's conclusion in the Circular No. A–25, that the IOAA does not authorize an agency to recover for services " 'when the identification of the ultimate beneficiary is obscure and the service can be *primarily* considered as benefiting [sic] broadly the general public.' " *See* 415 U.S. at 350–51 [94 S.Ct. at 1154] (*quoting* Budget Circular No. A–25, Sept. 23, 1959).
 Brief of Appellants/Cross–Appellees at 24 (emphasis added by Appellants/Cross–Appellees). The plaintiffs call it "[t]he *New England Power Co.* standard for determining when an agency service primarily benefits the public." *Id.*

the general public will not be recouped through collection of fees....

*Electronic Indus.*, 554 F.2d at 1114 n. 12 (quoting 48 F.C.C.2d 402 (1974)). After highlighting that passage we sent the following message:

The term "primarily" is misleading, and we reject any suggestion that the Commission should be limited to charging fees for those services where the benefit to the private party is greater than the benefit to the public....

*Id.* In short, we killed the weighing test twenty years ago. It is puzzling, then, that the majority now sounds the alarm (and repudiates our precedent to boot) simply because a litigant claims to find *dicta* in our cases to support its long-rejected theory.